COOLEY LLP
MICHAEL G. RHODES (116127) (rhodesmg@cooley.com)
WHITTY SOMVICHIAN (194463) (wsomvichian@cooley.com)
KYLE C. WONG (224021) (kwong@cooley.com)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
Telephone:     (415) 693-2000
Facsimile:     (415) 693-2222

Attorneys for Defendant
GOOGLE INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE INC. GMAIL LITIGATION | Case No. 5:13-md-002430 LHK (PSG)<br><br>**EXHIBIT A TO DECLARATION OF HAN LEE IN SUPPORT OF DEFENDANT GOOGLE INC.'S ADMINISTRATIVE MOTION TO FILE DOCUMENTS AND PORTIONS OF DOCUMENTS UNDER SEAL** [D89]<br><br>Judge:     Hon. Lucy H. Koh<br>Dept:     Courtroom 8 – 4th Floor |

**[PUBLIC REDACTED VERSION]**

# Exhibit A

**(Plaintiffs' Consolidated Motion for Class Certification)**

**[Re: ECF No. 85]**

**FILED UNDER SEAL PER JUDGE KOH'S AUGUST 6, 2014 ORDER
[ECF NO. 180]**

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21339827

DECL. OF LEE I/S/O GOOGLE INC.'S
ADMIN. MOT. TO FILE UNDER SEAL
CASE NO. 5:13-MD-002430 LHK (PSG)

WYLY~ROMMEL, PLLC
Sean F. Rommel (*Pro Hac Vice*)
Email: srommel@wylyrommel.com
4004 Texas Boulevard
Texarkana, Texas 75503
Telephone: (903) 334-8646
Facsimile: (903) 334-8645

CORY WATSON CROWDER & DEGARIS, P.C.
F. Jerome Tapley (*Pro Hac Vice*)
Email: jtapley@cwcd.com
2131 Magnolia Avenue
Birmingham, Alabama 35205
Telephone: (205) 328-2200
Facsimile: (205) 324-7896

*Plaintiffs' Co-Lead Counsel*

CARTER WOLDEN CURTIS, LLP
Kirk J. Wolden (SBN 138902)
Email: kirk@cwclawfirm.com
1111 Exposition Boulevard, Suite 602
Sacramento, California 95815
Telephone: (916) 567-1111
Facsimile:  (916) 567-1112

*Plaintiffs' Liaison Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE GOOGLE INC. GMAIL LITIGATION | Master Docket No.: 13-MD-02430-LHK |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | **PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**<br><br>Date:      January 16, 2014<br>Time:      1:30 p.m.<br>Judge:    Hon. Lucy H. Koh<br>Place:     Courtroom 8—4th Floor<br><br>Trial Date: October 20, 2014 |

///

///

///

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**
5:13-MD-002430-LHK

# TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................iii

I.     INTRODUCTION ......................................................................................... 2

II.    STATEMENT OF CLASS-WIDE FACTS ................................................... 3

    A.    Gmail ................................................................................................. 3

    B.    The Gmail Infrastructure................................................................... 3

        1.    Pre-████ 20██ Gmail Email Delivery Flow.. ................... 3

            a.    *Incoming Messages* ................................................. 3

            b.    *Outgoing Messages* ................................................. 4

        2.    ██████ 20██—████████ 20██ Gmail Email Delivery Flow............... 4

            a.    *Incoming Messages* ................................................. 4

        3.    ██████ 20██—████████ Gmail Email Delivery Flow.................. 5

            a.    *Incoming Messages* ................................................. 5

        4.    Secret User Profiling. .......................................................... 6

        5.    Additional Secret Activity—Google Voice (Telephone) and Email. ... 6

        6.    The Scope of Google's Secret Practices. .............................. 6

III.    LEGAL STANDARD ................................................................................... 8

    A.    The Class Definitions Are Specific, Objectively Defined, and Ascertainable. ............................................................................. 9

        1.    The Gmail User Classes .................................................... 11

        2.    The Non-Gmail User Classes ............................................ 11

        3.    Notice and Administration ................................................. 12

    B.    The Fed. R. Civ. P. 23(a) Requirements Are Met ......................... 13

        1.    Rule 23(a)(1)—Numerosity .............................................. 13

        2.    Rule 23(a)(2)—Commonality ........................................... 13

        3.    Rule 23(a)(3)—Typicality ................................................ 16

        4.    Rule 23(a)(4)—Adequacy ................................................ 17

**5.**     **Rule 23(b)(3)—Predominance** .................................................. 18

      **a.**     *No individualized issues exist as to Google's interception.* ....... 18

      **b.**     *No individualized issues exist on consent.* ............................... 20

      **c.**     *Google's avoidance of traffic acquisition costs negates consent* ................................................................................ 23

**6.**     **Rule 23(b)(3)—Superiority** ................................................... 24

**C.**     **Choice of Law—CIPA** ..................................................................... 25

    **1.**     **California's Connection To Google's Conduct Is Strong.** ................. 25

    **2.**     **No True Conflict Exists Between California Law and Foreign Laws.** .............................................................................. 27

    **3.**     **Application of Foreign Law Would Impair California's Interests.** .. 28

**IV.**     **CONCLUSION** ................................................................................................. 29

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**
Case No.: 13-MD-02430-LHK

# TABLE OF AUTHORITIES

*Page*

*Barcellos & Wolfsen, Inc.,*
   849 F. Supp. 717 (E.D. Cal.) ............................................................................. 16

*Bernhard v. Harrah's Club,*
   16 Cal. 3d 313 (Cal. 1976) ......................................................................... 27, 28

*Berry v. Funk,*
   146 F.3d 1003 (D.C. Cir. 1998) ....................................................................... 22

*Blumofe v. Pharmatrack, Inc. (In re Pharmatrack, Inc. Privacy Litig.),*
   329 F.3d 9 (1st Cir. 2003) ................................................................................ 21

*Browning v. Yahoo! Inc.,*
   2007 WL 4105971 (N.D. Cal. 2007) ................................................................ 12

*Diaz v. Hillsborough County Hospital Authority,*
   165 F.R.D. 689 (M.D. Fla. 1996) ..................................................................... 21

*Dunbar, et al. v. Google,*
   5:10-cv-194 (N.D. Cal.) ............................................................................ 12, 13

*Ferens v. John Deere Co.,*
   494 U.S. 516 (1990) ......................................................................................... 25

*Function Media, L.L.C. v. Google, Inc.,*
   2010 U.S. Dist. LEXIS 3273 (E.D. Tex. 2010) ............................................... 23

*Gene & Gene LLC v. BioPay LLC,*
   541 F.3d 318 (5th Cir. 2008) ........................................................................... 20

*General Telephone Co. of Southwest v. Falcon,*
   457 U.S. 147 (1980) ......................................................................................... 13

*Griggs-Ryan v. Smith,*
   904 F.2d 112 (1st Cir. 1990) ............................................................................ 16

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) .............................................................. 13, 17, 18

*Hanon v. Dataproducts Corp.,*
   976 F.2d 497 (9th Cir. 1992) ...................................................................... 16, 17

*Harris v. comScore, Inc.,*
   2013 U.S. Dist. LEXIS 47399 (N.D. Ill. April 2, 2013) ...................... 15, 16, 20

*Hinman v. M&M Rental Center, Inc.,*
   545 F.Supp.2d 802 (N.D. I11. 2008) ................................................................ 20

*Hurtado v. Superior Court,*
   11 Cal.3d 574 (Cal. 1974) ............................................................................... 27

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**
Case No.: 13-MD-02430-LHK

*In re: comScore, Inc.,*
   No. 13-8007, 7th Cir. June 11, 2013 ....................................................................... 15

*In re Netflix Privacy Litigation,*
   2012 WL 1598819 ................................................................................................... 12

*In re Netflix Privacy Litigation,*
   2012 WL 2598819 ................................................................................................... 12

*In re TFT-LCD (Flat Panel) Antitrust Litigation,*
   2012 WL 253298 (N.D. Cal. 2012) ........................................................................... 9

*In re Vioxx Products Liability Litigation,*
   478 F.Supp.2d 897 (E.D. La. 2007) ......................................................................... 25

*Int'l Molders' & Allied Workers' Local 164 v. Nelson,*
   102 F.R.D. 457 (N.D. Cal. 1983) ............................................................................. 13

*John Hopkins, et al. v. Styker Sales Corp., et al.,*
   2012 U.S. Dist. LEXIS 67101 (N.D. Cal. 2012) ........................... 8, 9, 14, 17, 18

*Kavu, Inc. v. Omnipak Corp.,*
   246 F.R.D. 642 (W.D. Wash. 2007) ......................................................................... 20

*Kearney v. Salomon Smith Barney, Inc.,*
   39 Cal. 4th 95 (Cal. 2006) ........................................................................... 26, 27, 28

*Keilholtz v. Lennox Hearth Products, Inc.,*
   268 F.R.D. 330 (N.D. Cal. 2010) ......................................................................... 9, 12

*Lance Camper Manufacturing Corp. v. Republic Indemnity Co.,*
   44 Cal. App. 4th 194 (1996) ..................................................................................... 15

*Landsman & Funk v. Skinder-Strauss Assoc.,*
   640 F.3d 72 (3rd Cir. 2011) ...................................................................................... 20

*Lerwill v. Inflight Motion Pictures, Inc.,*
   582 F.2d 507 (9th Cir. 1978) ...................................................................................... 9

*Lundell v. Dell, Inc.,*
   2006 WL 3507938 (N.D. Cal. 2006) ........................................................................ 12

*Mazza v. Am. Honda Motor Co.,*
   666 F.3d 581 (9th Cir. 2012) ....................................................................... 25, 26, 27, 29

*McCann v. Foster Wheeler LLC,*
   48 Cal.4th 68 (Cal. 2010) ......................................................................................... 28

*Meeker v. Belridge Water Storage Dist.,*
   2006 U.S. Dist. LEXIS 91775 (E.D. Cal. 2006) ...................................................... 15

*Meredith v. Gavin,*
   446 F.2d 794 (8th Cir. 1971) .................................................................................... 23

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**
Case No.: 13-MD-02430-LHK

iv

*Mullane v. Central Hanover Bank & Trust Co.*,
    339 U.S. 306 (1950)..........................................................................................12

*Ohayon v. Hertz Corp.*,
    2012 U.S. Dist. LEXIS 148991 (N.D. Cal. 2012) ........................................13

*Reich v. Purcell*,
    67 Cal. 2d 551 (Cal. 1967)........................................................................27, 28

*Saf-T-Guard International, Inc. v. Vanguard Energy Services, LLC*,
    2012 WL 6106714 (N.D. Ill. Dec. 6, 2012)..................................................20

*Schulken v. Wash. Mut. Bank*,
    2012 U.S. Dist. LEXIS 2005 (N.D. Cal. Jan. 5, 2012) ...........................16, 24

*Silber v. Mabon*,
    18 F.3d 1449 (9th Cir. 1994) ........................................................................12

*Tasion Communs v. Ubiquiti Networks, Inc.*,
    2013 U.S. Dist. LEXIS 121207 (N.D. Cal. 2013) .........................................28

*United States v. Westlands Water Dist.*,
    134 F. Supp. 2d 1111 (E.D. Cal. 2011)........................................................16

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011)......................................................................13, 14, 21

*Washington Mutual Bank v. Superior Court*,
    15 P.3d 1071 (Cal. 2001) ....................................................................25, 26, 28

*Williams v. Poulos*,
    11 F.3d 271 (1st Cir. Me. 1993) ..............................................................16, 22

*Wilson Arlington Co. v. Prudential Ins. Co.*,
    912 F.2d 366 (9th Cir. 1990) ........................................................................16

*Zeisel v. Diamond Foods, Inc.*
    2011 WL 2221113 (N.D. Cal. 2011) ..............................................................9

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2011) ......................................................................25

**STATUTES**

2 U.S. Code Cong. & Admin. News, 90th Cong. 2d Sess. 2236 (1968) ......................................23

18 U.S.C. § 2511 ............................................................................................................23

Cal. Civ. Code § 3.4........................................................................................................3

Cal. Civ. Code § 3.6................................................................................................3, 11, 12

CIPA § 631 ..............................................................................................................19, 25

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**
Case No.: 13-MD-02430-LHK

**RULES**

Federal Rule of Civil Procedure 23(a) ................................................................. 1

Federal Rule of Civil Procedure 23(a)(1) ........................................................... 13

Federal Rule of Civil Procedure 23(a)(2) ........................................................... 13

Federal Rule of Civil Procedure 23(a)(3) ........................................................... 16

Federal Rule of Civil Procedure 23(a)(4) ........................................................... 17

Federal Rule of Civil Procedure 23(b)(3)……..................................... 1, 9, 18, 24

Federal Rule of Civil Procedure 23(g)(1) ........................................................... 18

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**
Case No.: 13-MD-02430-LHK

TO DEFENDANT GOOGLE INC. AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on January 16, 2014, at 1:30 p.m. in Courtroom 8, fourth floor, Plaintiffs will move for class certification. This motion will be made on the grounds that questions of law and fact common to the Classes predominate over any questions affecting individual members.

The motion will be based on: this Notice of Motion; the following Memorandum of Points and Authorities; the accompanying Declarations of Sean F. Rommel, F. Jerome Tapley, Kirk J. Wolden, Richard M. Golomb, C. Lance Gould, Thomas P. Rosenfeld, and Michael K. Ng; the accompanying Trial Plan; [Proposed] Order Granting Class Certification; the records and files in this action; and such other matters as may be presented before or at the hearing of this motion, including arguments of Counsel.

## STATEMENT OF ISSUES TO BE DECIDED (L.R. 7-4(a)(3))

Whether Plaintiffs satisfy the requirements of Fed. R. Civ. P. 23(a) and 23(b)(3) by showing that (1) the Class is so numerous that joinder of all Class Members is impracticable; (2) there are common issues of fact or law; (3) Plaintiffs' claims are typical of the Class Members' claims; (4) Plaintiffs and their counsel will adequately represent the interests of the Class; (5) class treatment is superior to other methods of adjudication; and, (6) the following common issues of fact and law predominate:

- Under the ECPA, and the Maryland and Florida state analogues:

  - Does Google **intercept or endeavor to intercept** Class Members' email messages?

  - Does Google **use or endeavor to use** the contents of Class Members' email messages, knowing or having reason to know that it obtained the information through a violation of the ECPA?

  - Does Google engage in the conduct described above **intentionally**?

  - Under the ECPA, do any of the parties to the email communications **consent** to Google's interception or use of the email messages?

  - For the Maryland and Florida Sub-Classes, do all parties **consent** to Google's interception of the email messages?

  - Can minors **consent** to Google's interception or use of the email messages?

  - Does Google's interception through the use of a device occur in the ordinary course of Google's business as an electronic communications service provider facilitating

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**

the transmission of the communication or incidental to the transmission of such communication?

- Are Plaintiffs and Class Members entitled to injunctive and/or statutory monetary relief?

- Under CIPA (Scott I, Harrington, and Kovler Subclass)

  - Does Google willfully **read or attempt to read**, while in transit, the contents or meaning of Class Members' email messages?

  - Does Google willfully **learn or attempt to learn**, while in transit, the contents or meaning of Class Members' email messages?

  - Does Google **use or attempt to use** the contents of Class Members' email messages?

  - Do all parties **consent** to Google's conduct of reading or learning as described above?

  - Are Plaintiffs and Class Members entitled to injunctive and/or statutory monetary relief?

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Google "endeavors" in a uniform manner to secretly and unlawfully open, read, extract, acquire, learn, and use the content of people's private email messages—while those messages are in transit—in violation of CIPA, ECPA, and the state analogues.  In fact, Google endeavors to determine the meaning of every email message that flows through its system: "**Google does try to—the Google systems try to endeavor the meaning of mustang, you know, by looking at the relevant content of that email**... **and endeavor, and as a result, try to figure out your use of the word.  Like the example used was mustang, right, the car versus the horse**." (Rommel Dec., Ex. I, pp. 294:15-17, 296:16-18, emphasis added.)   The uniform nature of Google's secret content extraction, acquisition, and use practices–practices that are not necessary for or part of the Gmail delivery process–and Google's failure, through its uniform disclosures, to truthfully and adequately inform consumers about these secret and unlawful privacy violations, make this case perfectly suited for class treatment.  As the Court aptly recognized on consent: "I've looked through the two terms of service and the four privacy policies and I just don't see in there any explicit language that the content of e-mails is going to be reviewed to create targeted advertising or to create user profiles. ...Why wouldn't [Google]

1  just say 'the content of your e-mails?'" (Doc. 66, 15:19-23, 20:2-3.)

2  **II.     STATEMENT OF CLASS-WIDE FACTS**

3      The class-wide evidence demonstrates the following:

4      **A.     Gmail**

5      Google operates a web-mail service named Gmail.  (Rommel Dec., Ex. A, 15:4-8.)

6  Within Gmail, users can send and receive email messages, make telephone calls, and chat.

7  Utilizing Gmail, users send outgoing messages and receive incoming messages.  The email

8  messages have defined Internet Message Formats with destination address fields specifying the

9  recipients of the messages, and Google recognizes the emails have a designated sender and

10 recipient. (*Id.*, Ex. B, RFC 2822, §§ 3.4, 3.6.2, & 3.6.3; Ex. A, 22:7-9.)

11     **B.     The Gmail Infrastructure**

12     There are three identified time periods reflecting changes to the Gmail Infrastructure.

13 Within each time period, the Gmail Infrastructure was/is uniform.

14     **1.     Pre-████ 20██ Gmail Email Delivery Flow.**

15     **a.     *Incoming Messages***

16     When a Gmail user with an @gmail.com email address receives an incoming email

17 message, Google transmits the message to a server or device known as the ████████████

18 ████████████████████. (*Id.*, Ex. C, 30:22-31:8; Ex. D, 101:12-19,

19 105:8-18; 106:10-21; 117:11-22, 133:2-14, 195:9-19.)  Google's ████████ ***is not*** a piece of

20 the Gmail infrastructure and it is not necessary for the delivery of the message.  (*Id.*, Ex. A,

21 50:2-8.) ████████████, Google reads or attempts to read the content of an email

22 message for keywords; it creates weighted lists of terms; it extracts semantic clusters from a set

23 of terms in the content; assigns ████████ ████████████████████

24 (*Id.*, Ex. E.)  Through PHIL clusters, Google learns "concepts" by learning an explanatory

25 model of text.  (*Id.*, Ex. F.)  PHIL's concepts are supposed to model the *actual ideas* in a

26 person's mind before that person accesses the text (email).  (*Id.*, Ex. F.)  In addition to the

27

28  ───────────────
[1] Probabilistic Hierarchical Inferential Learner (PHIL) clusters amount to the inferred meaning of particular words or phrases derived by reading, extracting, and acquiring the content of the email message. (*Id.*, Ex. F, 1-2).

1    ████████████ for @gmail.com users, Google Apps EDU users, and Cable One users, Google

2    uses the ████████████████████ to read, learn, extract, and acquire the content of

3    all email messages. (*Id*., Exs. G and H.[2])  Using these devices, as well as those described

4    below, Google "endeavors" or "attempts" to determine the *actual meaning* of the words used

5    within the Class Members' private email messages. (*Id*., Ex. I, 294:8-20, 295:24-296:3, 296:13-

6    18, 296:24-297:2.)

7    █████████████████████████████████, Google surreptitiously

8    collects data acquired from the email message to create metadata or annotations. (*Id.*, Ex. D,

9    45:23-46:20, 202:19-23.)  This metadata is collected and maintained separate and apart from the

10   email message, and is also stored in the secret user profiles. (*Id.*)  The Gmail user has no access

11   to the metadata, and Google treats it as its own property. (*Id.*, Ex. D, pp. 70:8-71:15; Ex. M.)

### b.   *Outgoing messages*

13          When a Gmail user sends an original outgoing message from an @gmail.com account,

14   Google transmits the outgoing message to the ████████████████ reads, learns,

15   extracts, and acquires the content and meaning of the message as described above. (*Id.*, Ex. C,

16   31:11-18.)   Following the ████████ reading, learning, extraction, and acquisition of

17   content and meaning, Google transmits the email message to the intended recipient.

### 2.   ████ 20██ — ████ 20██ Gmail Email Delivery Flow.

### a.   *Incoming Messages*

20          In ████ 20██ Google began routing incoming non-spam messages to ████████

21   ███████████████████ (*Id.*, Ex. D, 209:11-18; Ex. J, 17; Ex. K & L.)

22   Google ██████████ to deliver messages—it is not even a part of the Gmail delivery

23   team's responsibilities, and Google can/used to deliver messages *without* routing the messages

24   ████████████ (*Id.*, Ex. A, 17:6-13, 17:19-18:6, 40:23-41:3, 41:16-25, 44:16-19.) ████

25   allows Google to read, learn, extract, acquire, and use message content and meaning before and

26   separate from the CAT2 mixer–***regardless of whether the Gmail user receives advertisements.***

27

28   ───────────────────
[2] The specific devices mentioned in this motion are examples of the types of devices Google
uses to read, learn, extract, and acquire the content of the email messages.  The examples are not
an exhaustive list.

(*Id.*, Ex. A, 15:15-16:18, 39:1-10; Ex. C, 19:9-16; Ex. K; Ex. AA.) Even for those @gmail.com users who opt out of personalized ads, their emails are still read by Google and their data is still extracted and acquired ▇▇▇ for Google's subsequent use.  (*Id.*)  In addition, by contract, Google is prohibited from serving advertisements to Google Apps EDU and Cable One Class Members–Google even represents that no "ad-related scanning or processing" with these emails occurs.  (*Id.*, Ex. Q, ¶ 1.7; Doc. 46-3, ¶ 1.6; Doc. 46-4, ¶ 1.6; Ex. R, emphasis added.)  But, Google submits each of these emails to ▇▇▇▇▇▇▇ for reading and thought data collection.  (*Id.*, Ex. A, 15:15-16:18; Ex. C, 19:9-16, 21:7-10, 29:21-22:6 ; Ex. K; Ex. AA.)

Google uses the ▇▇▇ to read, learn, extract, and acquire the content and actual meaning of the transmitted message, and to identify the following: (1) keywords; (2) PHIL/REPHIL clusters, which are groupings of words; (3) verticals, which indicate concepts; (4) a commercial score; (5) URL links; (6) package tracking; (7) address information; (8) information regarding receipts, travel itineraries, and domains; and (9) other information from the content of the email message.  (*Id.*, Ex. C, 19:9-16.) ▇▇▇▇ Google "*endeavors*" to read every message that clears the spam classification.  (*Id.*, Ex. A, 65:21-66:8, 66:16-22.)  The ▇▇▇ Google to collect the acquired content and meaning to create metadata or annotations.  (*Id.*, Ex. A, p. 41:1-9; Ex. C, 19:17-20; Ex. K, 4; Ex. D, 209:11-18; Ex. N.)  The metadata containing the content and meaning of the Class Members' emails is stored in secret user profiles.  (*Id.*, Ex. C, 29:21-30:6; Ex. D, 202:19-203:15; Ex. K; Ex. N.) Eventually, the acquired content and meaning is uploaded to Google's ▇▇▇ and Google uses it across its network of products.  (*Id.*, Ex. D, 205:8-206:3, 207:1-5; Ex. AA.) Thus, the content and meaning is collected and stored separately from the email in a person's in-box.

      **3.**   ▇▇▇ **20**▇—▇▇ **Gmail Email Delivery Flow.**

      **a.**   *Incoming messages*

In approximately ▇▇ of 20▇ Google ▇▇▇▇▇▇.  (*Id.*, Ex. C, 21:25-28.)  After ▇▇ of 20▇ through the ▇▇, Google *endeavors* to read

*every incoming* email message to a Gmail user.  (*Id.*, Ex. A, 65:3-12.)

### 4. Secret User Profiling.

Google uses Class Members' email content and meaning to create secret user profiles and to spy on its Gmail users.  (*Id.*, Ex. C, 29:21-30:6; Ex. D, 202:12-13; Ex. M; Ex. N; Ex. O; Ex. P.)  Google generates these profiles from the annotations or metadata ███████████ and Google maintains the profiles separate from the Gmail users' inboxes.  (*Id.*, Ex. C, 19:17-20; 29:21-30:6; Ex. D, 202:12-206:3.)  Further, Google uploads the information from these user profiles to Google's ██████ components for use across its services.  (*See* Ex. D, 207:1-5.)

### 5. Additional Secret Activity—Google Voice (Telephone) and Email.

Google Voice (telephone system) is integrated with Gmail.  (*Id.*, Ex. A, 75:12-21; 75:25-76:4; 76:11-76:3.)  Google admits that for those telephone calls that are transcribed to email form, ████████ Google reads and learns the content and meaning of those phone messages to acquire the actual thoughts and concepts.  (*Id.*, Ex. A, 75:12-21; 75:25-76:4; 76:11-76:3; Ex. C, 18:24-19:20.)  But, Google does not inform anyone that it reads telephone messages.

### 6. The Scope of Google's Secret Practices.

Aaron Rothman, the Declarant who offered a number of exhibits on "consent" in support of Google's motion to dismiss and Google's corporate representative on the issue of consent, testified that Google *did not have* the capability to determine the meaning of private messages:

> Q.   But Google's processes actually acquire the semantics of Gmail messages, correct? . . . .
>
> A.   Again, you're—you're applying, sort of, traits of a human to an automated—a computer system. . . .
>
> Q.   Your company uses algorithms and automated processing and scanning to read messages to tell what the message is actually saying; correct?
>
> A.   So again, it's not reading them.  It is scanning them. You—you're using terminology—just to be clear, you're using terminology that I use—that a human would describe their own interactions.  ***And as much as I'd love it to be the case, machines aren't quite that advanced.***

(*Id.*, Ex. I, p. 264:5-24, emphasis added.)

> Q.   We'll say scan.  Are you trying to tell this jury that Google picks up on a keyword like "mustang," but that it doesn't, then, scan the rest of the email to determine the concept, the thought, the ideas and the author of the message to determine the meaning of the message?

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**

> A.  Again, I—I can only speak generally, because you've—you've asked a—a technical question.  I don't want to give you misleading information.  But generally speaking, ***the Google services do not interpret meaning.  They scan the content and, therefore, provide the services.***

(*Id.*, Ex. I, 267:4-16, emphasis added; see also Ex. I, 255:17-267:16, for the entire portion of testimony where Mr. Rothman denies Google's ability to determine concepts and meaning.)  One hour later, Mr. Rothman—after a break to confer with Google's Counsel, and without reviewing any documents or speaking to any Google employees—*reversed Google's testimony*:

> So I was going to say before you jump in, I just wanted to add one clarification for the record.  You know, earlier we had a lot of back and forth about meaning, and you had used the specific example around the mustang . . . .  And I wanted to be clear that ***through the automated process, Google does try to—the Google systems try to endeavor the meaning of mustang, you know, by looking at the relevant content of that email—excuse me—not looking, trying to scan and process.  And I want to make it also clear that that is covered under the Terms of Service***

(*Id.*, Ex. I, 294:8-20, 296:4-298:6, emphasis added.)   Mr. Rothman shed further light on Google's actions to *endeavor* to determine meaning:

> Again, I want to clarify that there is no human deriving meaning, but that the automated system is able to automatically process and ***endeavor, and as a result, try to figure out your use of the word.***  Like the example used was mustang, right, the car versus the horse.

(*Id.*, Ex. I, 296:13-18, emphasis added.)

Rothman, Google's witness on consent, could not answer questions concerning: Google's disclosures, and how those disclosures relate to Google's content extraction and acquisition practices.  (*Id.*, Ex. I, (*Id.*, Ex. I, 186:19-188:1, 193:11-208:3.)   Similarly, Mr. Rothman could not describe what Google means by the term "automated processing" or even what "automated processing" entails.  (*Id.*, Ex. I, 205:14-2:08:3.)  He didn't even know when or where Google acquires the message content—or whether Google discloses where the interception occurs.  (*Id.*, Ex. I, 2:08:4-210:12, 211:7-213:7.)  Google's witness on consent *and* Google's employee who led the negotiations on the Cable One Google Apps contract were both ignorant of Google's secret practices.  (*Id.*, Ex. I, 215:2-216:21, 217:23-220:11;*Id.*, Ex. S, 18:17-24).

Rothman testified that Google's disclosures were very clear on the issue of reading and content extraction of *outbound* emails—even though Google, for years, has affirmatively denied such actions and taken contrary positions on reading outbound email.[3]  (*Id.*, Ex. I, 304:24-312:6, 312:24-320:9.)  For over two years and in ***three separate courts***, Google affirmatively asserted that it did not read, extract, and acquire the content of outbound mail—*ever*.  (*Id.*, Ex. D, (July 25, 2011) 200:5-12, "So we don't perform scans of outgoing email."; Ex. U (April 9, 2012), at 9, denying scanning of outbound emails for advertising; Ex. T, (June 13, 2012), "Outbound emails are not scanned for purposes of targeted advertising and ads are not attached to outbound emails."; and Ex. J (February 8, 2013), at 12.)  In April of 2013, Google admitted for the first time that it read, extracted, and acquired outbound email message content through the ███  ███  (*Id.*, Ex. V (April 1, 2013), 8:22-24.)  Even so, a *third Google engineer* testified in August of 2013 that he believed the "████████ . . . is not part of the send process."  (*Id.,* Ex. A, 68:8-10.)  Mr. Rothman was asked to explain the discrepancies: "If Google in four different cases provides different answers as to the question of whether it scans outbound email for the purposes of targeted advertising, how in the world can a Gmail user or any person out there know that it does those activities?"  (*Id.,* Ex. I, 318:17-22.)  Mr. Rothman responded that the user agreements "are very clear to the user about Gmail's processing of content" and that there were "other [unidentified] sources that make it very clear to users how the service works."  (*Id.*, Ex. I, 318:24-319:4.)

## III.   LEGAL STANDARD

Class certification is governed by Federal Rule of Civil Procedure 23.  "Whether or not to certify a class is within" the Court's discretion.  *John Hopkins, et al. v. Styker Sales Corp., et al.*, 2012 U.S. Dist. LEXIS 67101, *12 (N.D. CAL. 2012).   The Court's inquiry into certification begins with a determination of whether "an identifiable and ascertainable class exists."  *Id.* at *13.  Once Plaintiffs identify such classes, Plaintiffs must then "establish that '(1)

---

[3] Q.    Mr. Rothman, could you please tell the members of the jury where Google discloses that it scans outbound email for the purposes of delivering targeted advertising? . . .

A.    I may not be able to address specific wording without going through every document, but that is included in the automated processing, as I understand it . . . . I think the privacy policy does a—a great job."

(*Id.*, Ex. I, 304:24-305:11.)

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**

the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.'" *Id.* at *13-14 (quoting, FED. R. CIV. P. 23(a)).  In the present case and pursuant to Rule 23(b)(3), the Court must also find that the questions of law or fact "'common to the class members predominate over any questions affecting only individual matters, and that a class action is superior to other available methods of fairly and efficiently adjudicating the controversy.'" *Id.* at *14-15 (quoting FED. R. CIV. P. 23(b)(3)).

### A.    The Class Definitions Are Specific, Objectively Defined, and Ascertainable.

The cornerstone of ascertainability is a class definition that gives notice to Class Members.  Here, the class definitions are clear and precise, specifying "a distinct group of plaintiffs whose members [can] be identified with particularity."  *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9ᵗʰ Cir. 1978).[4]

Plaintiffs propose the following ascertainable and identifiable classes:[5]

Plaintiff Dunbar seeks to represent the following Class consisting of:

**All natural persons who are Cable One users and who have, through their Cable One Google Apps email accounts, (1) sent an email message to an @gmail.com address, (2) sent an email message to an @cableone.com address, or (3) received an email message, within two years before the filing of this action up through and including the date of class certification.**

Plaintiffs Fread and Carrillo seek to represent the following Class consisting of:

**All natural persons who are Google Apps for Education users with an account at an educational institution within the United States, and who have, through their Google Apps for Education email accounts, (1) sent an email message to an @gmail.com address, (2) received an email message, within the longest period of time allowed by statute before the filing of this action up through and including the date of certification.**

Plaintiffs Scott, Harrington, and Kovler seek to represent the following ECPA Class consisting of:

---

[4] Courts in this District have approved less certain class definitions than the precise definitions offered here.  See e.g., *In re TFT-LCD (Flat Panel) Antitrust Litigation* 2012 WL 253298, at *3 (N.D. Cal. 2012); *Zeisel v. Diamond Foods, Inc.* 2011 WL 2221113, at *6 (N.D. Cal. 2011); and *Keilholtz v. Lennox Hearth Products, Inc.*, 268 F.R.D. 330, 336 (N.D. Cal. 2010).
[5] The exclusions to these class definitions are contained at Paragraph 387 of the Consolidated Complaint.

**All natural persons who reside in the United States, who have, through their non-Gmail accounts, (1) received an original email message from an @gmail.com address, or (2) sent an email message to an @gmail.com email address, within the longest period of time allowed by statute before the filing of this action up through and including the date of certification.**

Scott, Harrington, Kovler, Scott II and Knowles seek to represent the following sub-classes of the Scott, Harrington, and Kovler ECPA Class:

a.  Plaintiffs Scott, Harrington, and Kovler seek to represent the following CIPA sub-class consisting of:

**All natural persons who reside in the United States, excluding California residents, who have, through their non-Gmail accounts, (1) received an original email message from an @gmail.com address, or (2) sent an email message to an @gmail.com address, within the longest period of time allowed by statute before the filing of this action up through and including the date of certification.**

b.  Plaintiff Scott II seeks to represent the following sub-class consisting of:

**All natural persons who reside within the State of Florida who have, through their non-Gmail accounts, (1) received an original email message from an @gmail.com address, or (2) sent an email message to an @gmail.com address, within the longest period of time allowed by statute before the filing of this action up through and including the date of certification.**

c.  Plaintiff Knowles seeks to represent the following Sub-Class consisting of:

**All natural persons who reside within the State of Maryland who have, through their non-Gmail accounts, (1) received an original email message from an @gmail.com address, or (2) sent an email message to an @gmail.com address, within the longest period of time allowed by statute before the filing of this action up through and including the date of certification.**

Plaintiff A.K., as Next Friend of Minor, J.K., seeks to represent the following Class consisting of:

**All children in the United States who, at any time during the period commencing two years prior to the filing of this action up through and including the date of class certification, were at least 13 years of age and under the legal age of majority, had an @gmail.com account, and used his or her @gmail.com account to send an email to or receive an email from either: (1) a non-@gmail.com account; or (2) another @gmail.com subscriber who was at least 13 years of age and under the legal age of majority.**

The class-wide evidence supports a finding that Plaintiffs' proposed Class definitions are "identifiable and ascertainable."

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**

### 1.     The Gmail User Classes

The email accounts for Plaintiffs Dunbar, Fread, Carrillo, and AK (as next friend of JK), and the Classes they seek to represent are all Google accounts and each account holder can be identified.  (*Id.*, Ex. D, 28:7-17, 29:3-11, 37:14-20, 38:22-39:5, 134:25-135:25, 136:12-15.)  As to each, Google administers the accounts through GAIA ("Google accounts service").  (*Id.*)  GAIA contains the "name, the email address, the status, the date and time, the event, the IP and other information" about a particular Gmail/Google Apps user.  (*Id.*)  Plaintiffs and each Class Member can generate an "output of the gaiatwol command" for any particular email address that contains the following information: (1) the user's email address; (2) "user id" that is a representation of the Google account associated with the email address; and, (3) the first and last name of the account holder. [6]  (*Id.*)  Further, for each Gmail/Google Apps user, Google can easily verify Class Member information or even print out a "Google Subscriber Information" sheet that details a Class Member's name, email address, status, other possible "usernames," the dates in which the user logged-in, and the IP address of the computer or portable device used for that particular session.  (*Id.*, Ex. W.)  Google can even verify the *actual activities* of each and every Gmail/Google Apps user, including: receiving, reading, or sending email; searches; and idle time.  (*Id.*, Ex. P.)

After Class Members satisfy membership within the three respective definitions, each Class Member can objectively determine whether they have received an email or sent an email in accordance with their definitions.  Each email contains a Message-ID and header information that identifies the sent and received messages, and verifies Class Member status.  (*Id.*, B, § 3.6 (p. 20), § 3.6.4 (p. 23-24.)  Thus, these classes are "identifiable and ascertainable."

### 2.     The Non-Gmail User Classes

Each non-Gmail Class Member, from their non-Gmail account, can objectively determine and ascertain whether they have received an email from or sent an email to a Gmail user.  These emails would all contain a Message-ID and header information from Google that

---

[6] Google generated Mr. Dunbar's account information over lunch during a deposition.

identifies the sent and received messages, and verifies Class Member status.  (*Id.*, B, § 3.6 (p. 20), § 3.6.4 (p. 23-24).)  Thus, these classes are "identifiable and ascertainable."

### 3.   Notice and Administration

The Class Definitions also objectively provide for adequate notice and administration of the Classes.  Adequate notice is "the best practicable, 'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action[.]'"  *Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (quoting *Mullane v. Central Hanover Bank & Trust Co*., 339 U.S. 306, 314, (1950)).  Courts in this District have approved email as an appropriate form of direct notice.  *In re Netflix Privacy Litigation*, 2012 WL 1598819, at *4 ("Email notice is especially appropriate here given the online nature of Netflix's business and the fact that Settlement Class members had to provide a valid email address when creating their Netflix accounts.");  *Browning v. Yahoo! Inc.*, 2007 WL 4105971, at *4 (N.D. Cal. 2007) ("Email notice was particularly suitable in this case, where settlement class members' claims arise from their visits to Defendants' Internet websites.");  See also *Lundell v. Dell, Inc.,* 2006 WL 3507938, at *1 (N.D. Cal. 2006).[7]

Direct email notice will provide notice to users with Gmail addresses, Google Apps addresses (Cable One and EDU), and non-Gmail users with addresses in Google's Gmail system.  (*See infra* for the discussion on account information*,* Rommel Dec., Ex. D, 28:7-17, 29:3-11, 37:14-20, 38:22-39:5, 134:25-135:25, 136:12-15.)  For those Class Members who do not receive direct email notice, publication notice will ensure the "best practicable" notice.  *In re Netflix Privacy Litigation*, 2012 WL 2598819, at *4; *Browning v. Yahoo!, Inc*., 2007 WL 4105971, at *4.   Administratively, the Court can ascertain membership status without unreasonable effort or cost.  *Keilholtz*, supra, 268 F.R.D. at p. 336 ("[A] class definition is sufficient if the description of the class is 'definite enough so that it is administratively feasible for the court to ascertain whether an individual is a class member.'")  A Class Member can easily provide a Message ID and related header information (see below, III. B. 1. and 2) that

---

[7] Judge Folsom, who presided over the *Dunbar* case in the Eastern District of Texas prior to its transfer to this District, already found notice by email "particularly appropriate."  (Plaintiff's Request for Judicial Notice, Ex. 1, at p. 6, notice by email is "particularly appropriate here because it is the use of email that would potentially establish class membership.")

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**

allows the Court and Google to "ascertain whether an individual is a class member."  Where

class members live can be confirmed by official or other reliable address information.

### B.   The FED. R. CIV. P. 23(a) Requirements Are Met

#### 1.   Rule 23(a)(1)—Numerosity

The class-wide evidence shows that each of the proposed classes meets the numerosity

requirement.[8, 9]  While "satisfaction of the numerosity requirement is not dependent upon any

specific number of proposed class members . . . 'where the number of class members exceeds

forty, and particularly where class members number in excess of one hundred, the numerosity

requirement will generally be found to be met.'"  *Ohayon v. Hertz Corp.,* 2012 U.S. Dist.

LEXIS 148991, at 5-6 (N.D. Cal. 2012) (*quoting*, *Int'l Molders' & Allied Workers' Local 164 v.

Nelson*, 102 F.R.D. 457, 461 (N.D. Cal. 1983).  Here, numerosity is satisfied.

#### 2.   Rule 23(a)(2)—Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class."  All

questions of fact and law "need not be common to satisfy the rule."  *Hanlon v. Chrysler Corp.,*

150 F.3d 1011, 1019 (9th Cir. 1998).  While the threshold for commonality is not high,

"commonality requires the plaintiff to demonstrate that the class members 'have suffered the

same injury.'"  *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011) (quoting, *General*

*Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1980)).  The plaintiff must assert a

"common contention" that is of "such a nature that it is capable of classwide resolution—which

means that determination of its truth or falsity will resolve an issue that is central to the validity

of each one of the claims in one stroke."  *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. at 2551.

The plaintiff must "be prepared to prove that there are *in fact* sufficient" common questions of

law or fact.  *Id.*

---

[8] *See* Google's Response in Opposition to Motion for Class Certification, (Doc. 119), pp. 22-23 (Google's assertion of assumed class size in rebuttal to superiority), *Dunbar, et al. v. Google,* 5:10cv194, In the United States Court for the Eastern District of Texas, Texarkana Division.

[9] The estimated numbers were provided by Google at Ex. C, pp. 12:10-13 (Cable One App— Google has not provided figures for 2010); 13:16-18 (Google Apps EDU); and 14:22-27 (minors).  For the non-Gmail class, *See* Google's Response in Opposition to Motion for Class Certification, (Doc. 119), pp. 22-23 (Google's assertion of assumed class size in rebuttal to superiority), *Dunbar, et al. v. Google,* 5:10cv194, In the United States Court for the Eastern District of Texas, Texarkana Division.

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**

Plaintiffs' factual and legal claims establish a "common contention" or "central question"—whether Google engaged in the unlawful *interception, reading,* and *use* of the Class Members' email messages during the relevant time period.  These common contentions involve statutory violations with statutory elements, and the answer to any question on statutory elements will "likely generate a common answer 'apt to drive the resolution of this litigation.'" *Hopkins,* 2012 U.S. Dist. LEXIS at *19 (quoting, *Dukes*, 131 S. Ct. at 2551).

In Plaintiffs' Consolidated Individual and Class Action Complaint ("CC"), Plaintiffs assert a number of questions of law and fact common to all Class Members.  *See* Doc. 73, CC, ¶¶ 422, 423 (a-j), and 423 (§ 637.2 a-d).  A jury can answer the global questions of interception, reading, and use to render a dispositive result by reference to Google's own admissions obtained in this litigation.  Each of these questions are: (1) subject to uniform and common proof; and, (2) involve a determination that will resolve a central issue to the validity of each Class Members' claim.  In fact, each of these common questions will be resolved independently from any information from Plaintiffs or Class Members—all the common evidence lies with Google's common and uniform actions.

In support of Google's motion to coordinate these actions in this MDL, Google asserted that a "common factual predicate" with a "nucleus of common factual allegations" and "common questions of law" exist.  (Rommel Dec., Ex. Z, 7, 14, 16.)  Those common questions are the heart of this litigation:

- How Google scans emails;

- When the scanning takes place;

- What devices are used in the process;

- Whether the automated scanning is done in the Google's ordinary course of business;

- What data, if any, is collected;

- Whether and how Google uses such data obtained from the scanning process; and,

- Whether the plaintiffs and putative class members suffered any injury.

*///*

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**

(*Id.*, Ex. Z, 16-17.)  Google asserted that the remaining two common issues, "What disclosures Google provides about its automated scanning system," and "Whether the plaintiffs and putative class members consented to the scanning," amount to "common issues" that can be addressed through the "coordination of pretrial discovery" involving "Google and its witnesses."  (*Id.*, Ex. Z, 17.)  Notably, none of the common issues identified by Google are specific to Plaintiffs or the putative class members, but the issues are common across the spectrum of cases *as to Google's conduct*.  This makes sense because Google's actions form the nucleus of common facts.

On the issue of consent, the finder of fact can uniformly judge and apply Google's purported disclosures to determine the disclosure's truthfulness and sufficiency.  Google's consent witness, Aaron Rothman, testified that the *only* disclosures that could form the basis of consent are the Terms of Service, the privacy policy, the program policy, the Gmail legal notice, and the Gmail privacy notices.  (*Id.*, Ex. I, 39:24-47:9, 48:4-23, 52:11-59:22.)  Accordingly, an analysis separate and apart from these Google defined "user agreements" "has no place where a party manifested consent through the adoption of a form contract."  *Harris v. comScore, Inc.*, 2013 U.S. Dist. LEXIS 47399, *16 (N.D. IL April 2, 2013) (petition for leave to appeal denied, *In re: comScore, Inc.,* No. 13-8007, June 11, 2013, United States Court of Appeals for the Seventh Circuit).  Further, because the Google Terms of Service require the application of California law, implied contracts from sources beyond the "user agreements" are prohibited where an express contract exists.  *See Meeker v. Belridge Water Storage Dist.*, 2006 U.S. Dist. LEXIS 91775, 79-81 (E.D. Cal. Oct. 18, 2006), quoting *Lance Camper Manufacturing Corp. v. Republic Indemnity Co.*, 44 Cal. App. 4th 194, 203 (1996) (It is "'well settled … that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter.'").

///

///

///

///

The concept of express consent would be destroyed if implied consent could be based on a failed attempt at express consent:

> The basis for the rule that 'extrinsic evidence is inadmissible to interpret, vary or add to the terms of an unambiguous written instrument' is that if parties to an agreement could not rely on written words to express their consent to the express terms of that agreement, those words would become little more than sideshows in a circus of self-serving declarations as to what the parties to the agreement really had in mind. The parole evidence rule thus enables parties to rely on written instruments as embodying a complete memorial of their agreement, and to avoid costly and disruptive litigation over the existence of oral and implied terms that may or may not have been contemplated by the parties.

*United States v. Westlands Water Dist.*, 134 F. Supp. 2d 1111, 1136 (E.D. Cal. 2001) quoting *Barcellos & Wolfsen, Inc.*, 849 F. Supp. 717, 721 (E.D. Cal.) (quoting *Wilson Arlington Co.*, 912 F.2d 366, 370 (9th Cir. 1990) (internal citations and alteration marks omitted). This is especially true in the ECPA context because of the nature of the consent that is required. The defense of implied consent "is not, however, constructive consent." *Williams v. Poulos*, 11 F.3d 271, 281 (1st Cir. Me. 1993) (citing *Griggs-Ryan v. Smith*, 904 F.2d 112, 116 (1st Cir. 1990). "Rather, implied consent is 'consent in fact' which is inferred 'from surrounding circumstances indicating that the party knowingly agreed to the surveillance.'" *Id.* (citations omitted). "[I]mplied consent should not be casually inferred." *Id.* (citations omitted).

The scope of any consent, express or implied, will be commonly determined by Google's disclosures. *See Harris v. comScore, Inc.*, 2013 U.S. Dist. at *17 (Whether Google's actions and data "collection exceeds the scope of consent" also presents a common question.)

### 3.      Rule 23(a)(3)—Typicality

To satisfy the requirement for typicality, Plaintiffs must demonstrate their claims are typical of the Classes they seek to represent. *See* Rule 23(a)(3). The test for typicality "'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Schulken v. Wash. Mut. Bank*, 2012 U.S. Dist. LEXIS 2005, §at *32-33 (quoting, *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). It is the "nature" of the class representative's claim that is important and not the "specific facts from which it arose or the relief sought." *Id.* "Representative claims" are typical if "they are

'reasonably coextensive with those of absent class members; they need not be substantially identical.'" *Id.* at *32.

Plaintiffs' claims are typical of the Classes they seek to represent. Dunbar, Carrillo, and Fread each have Google Apps accounts, which Google treats for all material purposes as Gmail accounts, they seek to represent classes who have the same injury caused by the same course of Google's conduct. AK (JK) maintains a Gmail account and seeks to represent a class of minor Gmail account holders who have the same injury caused by the same course of Google's conduct. Harrington, Scott, Scott II, Knowles, and Kovler are non-Gmail users who have exchanged emails with Gmail users and suffered the same injury caused by the same course of Google's conduct. As to each named Plaintiff and putative Class Member, Google applied its uniform content extraction and acquisition practices to their email exchanges with Gmail users. In doing so, Google violated Plaintiffs' and Class Members' privacy rights entitling them to statutory damages and injunctive relief. Plaintiffs do not assert any claims for relief atypical to those of the Class, and all of the common questions posed for the Class apply equally to Plaintiffs' individual causes of action. Thus, typicality is satisfied.

### 4.       Rule 23(a)(4)—Adequacy

Rule 23(a)(4) requires "the representative parties will fairly and adequately protect the interests of the class." For adequacy, the Court must address two questions: (1) do Plaintiffs and their counsel "'have any conflicts of interest with other class members'"; and, (2) will Plaintiffs and their counsel "'prosecute the action vigorously on behalf of the class?'" *John Hopkins, et al.,* 2012 U.S. Dist. LEXIS at *25 (quoting, *Hanlon*, 150 F.3d at 1020).

Plaintiffs' and Class Members' claims are antagonistic to Google. No conflicts of interest exist between Plaintiffs, their Counsel, and putative Class Members. Plaintiffs will fairly and adequately protect the interests of the proposed Classes. Plaintiffs have already demonstrated their willingness and ability to represent the proposed Classes by: preserving and producing relevant documents, answering interrogatories, testifying at deposition, providing declarations in support of class certification, understanding their claims, communicating with

counsel, overseeing the case, making decisions, and protecting the interests of putative class members.  (Rommel Dec., Exs. EE-MM [class rep depos excerpts].)

Plaintiffs and their Counsel respectfully seek appointment of Sean F. Rommel, F. Jerome Tapley, Kirk J. Wolden, Richard M. Golomb, C. Lance Gould, Thomas P. Rosenfeld, and Michael K. Ng as Class Counsel.  Pursuant to Rule 23(g)(1), the Court must consider: (1) the work counsel has done in indentifying or investigating potential claims in the action;(2) Counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (3) Counsel's knowledge of the applicable law; and, (4) the resources that counsel will commit to representing the class.  Plaintiffs' Counsel offer their declarations as support.  (See Class Counsel Decs.)

Plaintiffs' Counsel have extensive and varied experience, not only in the class action context but in other complex cases.  Counsel are committed to zealously representing Plaintiffs and the interests of the Classes, and offer as proof of such commitment Counsel's efforts to: identify the factual and legal issues, draft and file the pleadings, draft and file various motions and responses, undertake discovery, prosecute the matter as a class action, present arguments at hearings, organize a legal team capable of prosecuting this action, advance the costs of litigation, and ultimately present this case for class certification and trial.

### 5.    Rule 23(b)(3)—Predominance

Plaintiffs assert that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Pro. 23(b)(3).  Predominance is addressed by asking whether "'common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication.'"  *John Hopkins, et al.,* 2012 U.S. Dist. LEXIS at *27 (quoting, *Hanlon*, 150 F.3d at 1022).

### a.    *No individualized issues exist as to Google's interception.*

Two common questions predominate:  (1) whether Google intercepts and/or reads Plaintiffs' and Class Members' email content; and, (2) whether Google uses the intercepted

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**

and/or read content.  First, under ECPA and the state law analogues, the common question is whether Google intercepts or *endeavors* to intercept Plaintiffs' and Class Members' email content.  The analysis includes: whether the communication is an electronic communication, whether it is intercepted or endeavored to be intercepted in transit by a device; whether Google extracts and acquires the email content for its substance, purport, and meaning; whether the ordinary course of business exception applies; and whether Google obtains consent for such interceptions.  The same common questions predominate under § 631 of CIPA except that the interception is judged by whether Google reads, *attempts* to read or to learn, Plaintiffs' and Class Members' email message content.  Second, Google's "use" of the intercepted email content "will be determined based on evidence common to the class"—namely Google's own documents and testimony.  With these two common questions in mind, Google already confessed the following facts:

- For every email received by a Gmail/Google Apps user, Google, ███████████ *endeavors* to intercept and *attempts to* read: (a) *every* message that ██████████████████ and (b) *every* message after ███████████████ (Rommel Dec., Ex. A, pp. 65:3-12, 65:21-66:8, 66:11-22, 67:1-12.)

- For every email received by an @gmail.com user, Google, ██████████ *endeavors* to intercept and *attempts to* read *every* message. (*Id.*, Ex. A, p. 73:15-24.)

- For every email sent by an @gmail.com user, Google, ███████████ *endeavors* to intercept and *attempts to* read every message. (*Id.*, Exhibit C, p. 31:16-18.)

- Google's "systems try to endeavor the meaning" of words within every email to "try to figure out your use of the word."  (*Id.*, Ex. I, pp. 294:8-20, 296:13-18.)

Google, ███████████ intercepts or *endeavors* to intercept the content of every email received by a Gmail/Google Apps users (Dunbar, Carrillo, Fread, and the Class Members they seek to represent) to determine the meaning of the words.  Google, ███████████ ███████████ intercepts or *endeavors* to intercept the content of every email received by A.K. (J.K.) to "try and figure out" what the email means.  Google, ███████████ intercepts or *endeavors* to intercept the content of every email sent by an @gmail.com user to any Class Member to determine the message's meaning.  Finally, Google, ███████████ ███████████ intercepts or *endeavors* to intercept the content of every email sent by any

Plaintiff or Class Member to an @gmail.com user to "endeavor the meaning" and "try to figure out your use of the word."  Thus, in applying these facts to the statutory elements, there are no individualized issues.

### b. *No individualized issues exist on consent.*

When consent or its absence can be adjudicated through generalized proof, consent issues pose no impediment to class certification.  *Harris v. comScore, Inc*., 2013 U.S. Dist. LEXIS 47399, at *27 (N.D. Ill. Apr. 2, 2013) ("In addition, the issues of whether plaintiffs consented to OSSProxy's data collection, the scope of that consent, and whether comScore exceeded that consent can all be determined on a class basis, as described above.").  Such is the case here because: (1) Google is the sole source of any information about its content extraction, acquisition, and use practices, and (2) all of Google's disclosures can be compared to Google's actual conduct to determine the truthfulness and sufficiency of the statements.

Numerous authorities confirm that consent can be determined on a class-wide basis whenever "individualized evidence" is not required.  *See Gene & Gene LLC v. BioPay LLC,* 541 F.3d 318 (5th Cir. 2008) (recognizing generalized proof can be used to determine the consent issue for the class); *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 650 (W.D. Wash. 2007) (In this case involving unsolicited faxes, the court found consent to be a common issue that satisfied predominance because, "common legal and factual issues will underlie the issue of whether the facsimiles were unsolicited and whether the recipients voluntarily provided their facsimile numbers for public distribution."); *Saf-T-Gard International, Inc. v. Vanguard Energy Services, LLC*, 2012 WL 6106714, *5 (N.D. Ill. Dec. 6, 2012) (In another TCPA case, the court found that the primary question would be how the defendant "had developed its fax recipient list, not the nature of the relationship between [defendant] VES and each putative plaintiff[,]" concluding "[t]hat question is subject to generalized proof."); *Landsman & Funk v. Skinder-Strauss Assoc.*, 640 F.3d 72, 94 (3rd Cir. 2011) (The court found that consent issues would not preclude class certification where there was a "class-wide means of establishing . . . lack of consent."); *Hinman v. M&M Rental Center, Inc.*. 545 F.Supp.2d 802, 806-807 (N.D. Ill. 2008) (The court rejected the theory that issues of consent to receive faxes are necessarily

individualized, and held that class certification is proper when "a defendant engages in a standardized course of conduct vis-à-vis the class members, and plaintiffs' alleged injury arises out of the conduct."); *Diaz v. Hillsborough County Hospital Authority*, 165 F.R.D. 689, 695 (M.D. Fla. 1996) (In a case alleging lack of informed consent for medical experimentation on a group of pregnant women, the plaintiffs alleged the general methods and procedures used by the hospital in enrolling the women in the research project was defective and the court held if "Plaintiff's allegations are proven, Defendants acted on grounds generally applicable to the class.").

The common nature of the consent determination is demonstrated in a question posed to Google's consent witness, Mr. Rothman: "If in the span of testifying under oath for Google on the topic of consent about whether or not a person looking at those statements would know whether Google is saying that they interpret words for meaning, in—in doing that today and having to come back and make this clarification, how could you ever expect a Gmail user or a non-Gmail user to know the difference?"  (Rommel Dec., Ex. I, 298:7-14.)  Mr. Rothman responded, "it is very clear in—in the multitude of documents provided by Google… ."  (*Id.,* Ex. I, 298:16-18.)  Plaintiffs agree that consent is determined in a common fashion by a discreet set of written Google documents.  Thus, the fact finder can compare Google's disclosures to its actual conduct in a class-wide manner.

Google has the burden to establish consent under the ECPA.  *Blumofe v. Pharmatrack, Inc. (In re Pharmatrack, Inc. Privacy Litig.)*, 329 F.3d 9, 22 (1st Cir. 2003).  As to the affirmative defense of consent, Google must "prove that there are *in fact*" issues to rebut Plaintiff's assertions of Rule 23 compliance.  *Dukes*, 131 S. Ct. at 2551 (emphasis added).  Ultimately, Google cannot present evidence that express or implied consent will involve individualized issues of class member experiences because Google's *own uniform written disclosures* form the only basis upon which Google could obtain consent.[10]  Here, there is *no evidence* that Google fairly informed ***anyone*** of the full scope of its interceptions.  Specifically,

---

[10] While the fact finder would conduct an analysis of consent based upon whether Google obtained expressed or implied consent, the operative disclosures for either must come directly from Google, and the fact finder would conduct a common objective analysis of those disclosures.

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**

Google did not inform anyone: that it intercepts all incoming messages while in transit (regardless of advertising) to mine the email content for its substance, purport, and meaning; and use that content to monitor user activity and for various profit-motivated purposes like creating secret user profiles.  Because Google did not make this disclosure to anyone, lack of consent can be adjudicated on a common basis for all Class Members.

Under the ECPA, implied consent simply cannot exist unless the party whose privacy is intruded upon has *actual knowledge* of the nature and extent of the intrusion.  "Implied consent is not constructive consent.  Rather, implied consent is 'consent in fact' which is inferred from surrounding circumstances indicating that the party *knowingly agreed*" to the intrusion. *Williams,* 11 F.3d 271 at 281.  In *Williams*, an employee knew that the company monitored employee telephone calls but the employee was not informed of either the manner of the monitoring (i.e., that the calls were recorded) or that his own calls would be monitored.  *Id.* The court concluded, "without *at least* this minimal knowledge . . . we do not see how his consent in fact to the monitoring could be inferred . . . ." *Id.* at 282 (emphasis added); See also, *Berry v. Funk,* 146 F.3d 1003, 1011 (D.C. Cir. 1998) ("Consent can only be implied when the surrounding circumstances convincingly show that the party knew about and consented to the interception").

Applying these consent principles to the facts of this case leads to the conclusion that common issues predominate over any individualized issues.  Google cannot obtain express consent because its own documents, the only source for what Google purports to disclose, do not adequately disclose the nature and use of its interception.  As the Court found in its detailed review, Google's disclosures lack sufficient information, and do not provide the knowledge necessary to form express consent, much less implied consent.  While Google may disagree on the merits, Google cannot deny that the question of express or implied consent is based on Google's uniform disclosures–disclosures perfectly suited for class-wide determination.

Because Google cannot point to any information which adequately and fairly reveals the nature and extent of the interceptions at issue, and which *did not originate* from Google,

Google's argument that individualized encounters with Google's purported disclosures will somehow affect the consent analysis is nothing more than a hypothetical with no factual basis. Cognizant of the fact that its disclosures are not adequate, Google also argues that the public somehow knows and understands that Google's thought mining practice is so commonplace that individualized issues of implied consent predominate.  The Court, however, has already rejected this argument.  (Doc. 69, 27:1-28:2.)

Google's implied consent argument also fails because Google provides no evidence that it has ever acknowledged an interception or revealed to anyone its practice of intercepting and using, for profit, the contents of Plaintiffs' and Class Members' emails.  Predominance is satisfied.

### c. *Google's avoidance of traffic acquisition costs negates consent.*

Pursuant to 18 U.S.C. § 2511(2)(d), a jury can determine whether Google's interception of email messages is for the "purpose of committing any . . . tortious act in violation of the . . . laws of the United States or any State," thereby rendering consent invalid.  Google intercepts incoming email to avoid paying "traffic acquisition costs"[11] for content data in violation of the proprietary interests of the owners of the content who have not consented to the interception or licensed the use of their data.  Due to the expressed limitations on the content licenses within user agreements, Google has no contractual right to message data that has yet to be received by the Gmail user *and* yet to be submitted for public viewing.  Yet, it treats such content as its own.

None of the statutes at issue act as licenses to acquire or create property rights.  The legislative history of § 2511 shows that Congress had concerns about a *consenting* party using the consent provision to steal personal property such as "business secrets."  *See Meredith v. Gavin*, 446 F.2d 794, 798 (8th Cir. 1971) (quoting, Senator Hart, 2 U.S. Code Cong. & Admin. News, 90th Cong. 2d Sess. 2236 (1968)).  To Google, the data within an email message (in transit) anticipates "ideas in a person's mind before they generate text" and that has substantial

---

[11] "Traffic acquisition costs" are the "money that Google pays publishers to compensate them for participating in Google's AdSense for Content Online."  *See Function Media, L.L.C. v. Google, Inc.,* 2010 U.S. Dist. LEXIS 3273, *10-11 (E.D. Tex. 2010); *see also* Rommel Dec., Ex. X.

value that Google normally has to pay to obtain.  (Rommel Dec., Ex. F, 2.)  Google mines the intercepted content *cost free*, proclaiming it as "Google owned data." (*Id*., Ex. P; Ex. D, pp. 70:8-71:15.)  It then generates ads and avoids having to pay the "traffic acquisition costs" for the intercepted content upon which the ad is based.  In doing so, Google violates its user agreements and converts the property interests of the content owners.

Ultimately, Google must to obtain proper consent to lawfully intercept, read, and use the content of Plaintiffs' and Class Members' emails.  Whether Google obtains consent through its opaque public "disclosures" is a common question for determination on a class-wide basis.  Thus, common issues of law and fact predominate.

### 6.        Rule 23(b)(3)—Superiority

The Class action is superior to other available methods of adjudication for this case.  In evaluating superiority, the Court must examine four factors: "(1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and, (4) the difficulties likely to be encountered in the management of a class action." *Schulken*, 2012 U.S. Dist. LEXIS 2005 (N.D. Cal. Jan. 5, 2012), at *44-45.  Google's secret conduct, its lack of truthful and sufficient disclosures, prevents the individual Class Members here from creating strong individual interests in separate actions–and no other action seeks relief on behalf of the Classes asserted in this case.  Google has already confirmed its desirability of concentrating the case in this forum where the aggregate of individual Class Members is represented by all fifty states.  Finally, for those Class Members who are Gmail users, Google is bound to require each individual user to litigate in Santa Clara County, California, pursuant to the forum selection clause in Google's Terms of Service.  (Doc. 46-2, ¶ 19; Doc. 46-5, ¶ 20.7.)  For most, the forum selection clause alone renders the filing of a suit impossible.  Further, Google has asserted that a uniform action is the proper mechanism for the overlap of claims in individual cases because "[s]eparately litigating those core issues separately in each of the

1    Actions would squander the resources of both the parties and the respective courts, while

2    creating a substantial risk of inconsistent results."  (Rommel Dec., Ex. Z, p. 7.)

3         Finally, management of the proposed classes presents no unique procedural or

4    substantive difficulties.  Notice can be accomplished by "direct" email notice to the

5    Gmail/Google Apps Class Members, and by court-approved publication notice to non-Gmail

6    Class Members.  Further, Google agrees that each Class Members' emails within their "inbox"

7    sufficiently prove their "receipt" claim.  (Doc. 223-1, p. 27:4-11.)  In addition, Google agrees

8    that Plaintiff (or any Class Member) who "seeks [to] quantify damages based on the number of

9    emails he sent to the other Gmail recipients, [] can do so by simply reviewing the 'sent items' of

10   his email account to determine which emails he sent to Gmail account holders."  (Doc. 223-1, p.

11   27:12-15.)  In fact, Google successfully asserted that it is "unnecessary for Plaintiff to review

12   the metadata associated with his emails in the form that they were received by other Gmail

13   users," to prove his claim.  (Doc. 223-1, p. 27:16-18.)  Thus, superiority is satisfied.

14        **C.    Choice of Law—CIPA**

15        Plaintiffs Scott I (a Maryland resident) and Harrington (an Alabama resident) filed suit

16   in the Northern District of California seeking to represent a forty-nine state Class (excluding

17   California residents) under the California Invasion of Privacy Act ("CIPA").  This Court "must

18   look to the forum state's choice of law rules to determine the controlling substantive law."

19   *Mazza v. Am. Honda Motor Co*., 666 F.3d 581, 589 (9th Cir. 2012), quoting *Zinser v. Accufix*

20   *Research Inst., Inc*., 253 F.3d 1180, 1187 (9th Cir. 2001).[12]

21        **1.    California's Connection To Google's Conduct Is Strong.**

22        The first step under California's choice of law rules obligates Plaintiffs Scott I,

23   Harrington, and Kovler to "show that California has 'significant contact or significant

24   aggregation of contacts' to the claims of each class member."  *Mazza*, 666 F.3d at 589, quoting

25   *Wash. Mut. Bank v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001).  Here, there are sufficient

26
27    [12] Plaintiffs Scott II's and Knowles' actions originated in Florida and Maryland.  In an MDL,
      absent a *Lexecon* waiver, the MDL court must apply the law of the transferor forum, including
28    the transferor forum's choice-of-law rules. *See Ferens v. John Deere Co.*, 494 U.S. 516, 524
      (1990). *See, e.g.*, *In re Vioxx Products Liability Litigation*, 478 F.Supp.2d 897, 903 (E.D. La.
      2007).  As no *Lexecon* waiver has occurred, Florida and Maryland law respectively apply to
      Scott II's and Knowles's claims.

contacts to apply California law.  Google, a California corporation, developed and implemented its Gmail business model from its California headquarters, including planning and implementing the interceptions, content extraction, and the use and deployment of the offending devices.  (Rommel Dec., Ex. A, p. 9:14-15, 20:9-12.) (The Gmail email "delivery team" is located and works in Google's office on Spear Street in San Francisco.)

All incoming and outgoing email messages passing through the Gmail system are processed through Google's spam filter.  (Rommel Dec, Ex. C, 18:24-19:1, 21:20-22:5, 23:13-15)  Google's spam filter is Postini, which has a public ip address, 64.18.1.158, and is located in Mountain View, California.  (Rommel Dec, Ex. OO)  Thus, every U.S. email message passing through the Gmail system, no matter the geographical location of its origin or ultimate destination, passes through California.[13]  Google also requires every Gmail user to consent to California law.  (Doc. 46-2, ¶ 19; Doc. 46-5, ¶ 20.7.)  Accordingly, California law applies because Google's unlawful conduct   occurs in California and Google selected California law. *See Mazza,* 666 F.3d at 590.

"Once the class action proponent makes this showing, **the burden shifts to the other side** to demonstrate 'that foreign law, rather than California law, should apply to class claims.'" *Mazza*, 666 F.3d at 590, quoting *Washington Mutual*, 15 P.3d at 1081 (emphasis added). "California courts apply the so-called governmental interest analysis, under which a court carefully examines the governmental interests or purposes served by the applicable statute or rule of law of each of the affected jurisdictions to determine whether there is a 'true conflict.'  If such a conflict is found to exist, the court analyzes the jurisdictions' respective interests to determine which jurisdiction's interests would be more severely impaired if that jurisdiction's law were not applied in the particular context presented by the case." *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95, 100 (Cal. 2006).

---

[13] Google refused to disclose the geographic location of its servers in response to Plaintiffs' interrogatory on the issue.  In addition, Google refused to allow its 30(b)(6) witness designated on that topic to identify the locations of its devices or servers—except to say they are not in California.  (Rommel Dec., Ex. A, p. 28:10-31:21; Ex. C 23:20-21.)  While Google did allow its 30(b)(6) witness to testify on his "personal knowledge," he did not name Alabama or Maryland as locations of its devices or servers.  (*Id*.)  Despite Plaintiffs' meet and confer efforts, Google has refused to provide the information through supplemental discovery responses or deposition testimony.

1    Plaintiffs have met their burden for application of California law.

2            **2.      No True Conflict Exists Between California Law and Foreign Laws.**

3            Here, no true conflict exists.  In its motion to dismiss, Google contended, primarily, that

4    Alabama's one party consent statute conflicted with California's two part consent statute.  But,

5    the Court aptly found:

6            Yet, it is not clear whether this difference in the scope of liability is material, that
             is whether it 'make[s] a difference in this litigation.'"  *Mazza*, 666 F.3d at 590.
7            This is because Plaintiffs contend that neither party has consented, while Google
             contends that all parties have consented.  [Citations omitted]  Accordingly, on
8            either party's theory of liability, the difference in state law would not be a
             material difference.
9

10   (Doc. 69, 34:25-35:4.)  Since the Court's analysis, nothing has changed that would alter the

11   result—one or all party consent; neither "make[s] a difference in this litigation." *Mazza*, 666

12   F.3d at 590.[14]  There is no true conflict.

13           The absence of a remedy under a given state's law cannot substantively conflict with the

14   remedy CIPA affords private citizens.  Such an absence indicates that the given state has no

15   interest in how another state like California might apply its own remedial scheme.  *See Kearney*,

16   39 Cal.4th at 110 ("Because Mexico had no interest in applying its limitation on wrongful death

17   damages, *Hurtado*, like *Reich*, did not present a true conflict.").  Likewise, a variation in the

18   statutory damages between the laws of California and a given state does not present a true

19   conflict.[15]  "[P]robability that one forum may be more generous than the other may not be

20   considered [citation], ..." because under California's choice of law rules "[t]he court does not

21   'weigh' the conflicting governmental interests in the sense of determining which conflicting law

22   manifested the 'better' or the 'worthier' social policy on the specific issue."  *Bernhard v.*

23   *Harrah's Club*, 16 Cal. 3d 313, 320 (Cal. 1976).  Because there are no material differences

24   among the states' laws, any variations among the statutory damages do not rise to the level of

25   policy considerations necessary to invoke an actual conflict.[16]  Thus, CIPA applies and the

26   _____

27   [14] This same conclusion applies to any of the approximately thirty-nine states whose wiretap
     laws can be characterized as one party consent laws.
     [15] *See e.g.*, *Reich v. Purcell*, 67 Cal.2d 551 (Cal. 1967); *Hurtado v. Superior Court*, 11 Cal.3d
28   574 (Cal. 1974).
     [16] This analysis is consistent with the approaches taken in *Kearney*, 39 Cal.4th at 100-01, and by
     this Court.  (Doc. No. 69 at p. 35, fn. 11, "[U]nder California choice of law analysis, differences

Court should end its analysis here.  *Washington Mutual*, 15 P.3d at 1081 ("[T]he trial court may properly find California law applicable without proceeding to the third step in the analysis if the foreign law proponent fails to identify any actual conflict or to establish the other state's interest in having its own law applied.")

### 3.     Application of Foreign Law Would Impair California's Interests.

Even if the Court undertook the third step of the analysis under California's choice of law rules, the outcome would be the same—CIPA applies.  "[I]f the court finds that there is a true conflict, it carefully evaluates and compares the nature and strength of the interest of each jurisdiction in the application of its own law 'to determine which state's interest would be more impaired if its policy were subordinated to the policy of the other state', and then ultimately applies 'the law of the state whose interest would be the more impaired if its law were not applied.'"  *Kearney*, 39 Cal. 4th at 108, quoting *Bernhard*, 16 Cal. 3d at 320.

California has a compelling interest in having its law applied because Google is a California resident with its operational nucleus in the Bay Area.  Further, Google requires every Gmail user to be bound by the application of California law.  (Doc. 46-2, ¶ 19; Doc. 46-5, ¶ 20.7.)  Accordingly, Google has already made the decision that California law applies for its activities related to its services of Gmail.  "[A] jurisdiction ordinarily has '**the predominant interest**' in regulating conduct that occurs within its borders… ."  *McCann v. Foster Wheeler LLC*, 48 Cal.4th 68, 97-98 (Cal. 2010) quoting *Reich v. Purcell*, 67 Cal. 2d 551, 556 (Cal. 1967) (emphasis added);  *See also Tasion Communs. v. Ubiquiti Networks, Inc.*, 2013 U.S. Dist. LEXIS 121207 at *41 (N.D. Cal. 2013), quoting *McCann*, 48 Cal. 4th at 98  ("As the California Supreme Court has recognized, states have an interest 'in regulating conduct that occurs within its borders' and applying its laws to corporations operating within its borders.").  Because, Google's conduct, relevant to the Scott I/Harrington/Kovler claims, originates in California, "California must be viewed as having a strong and continuing interest in the full and vigorous application of [CIPA]."  *Kearney*, 39 Cal.4th at 125.  "In short, California is the epicenter of the

in remedies alone are not dispositive.  The Court may resolve the conflict between California and foreign laws by 'apply[ing] California law in a restrained manner' with regard to monetary damages.  *Kearney*, 39 Cal. 4th at 100-01.")

practices at issue in this case for all Plaintiffs." (Doc. 69, 34:12.) Accordingly, California law should apply to the Scott I/Harrington/Kovler claims.

Here, any foreign jurisdictions' "interest in setting the appropriate level of liability for companies conducting business within its territory" is illusory. *Mazza*, 666 F.3d at 592 (*citing McCann*, 48 Cal. 4th at 91.) In *Mazza*, each "transaction took place" in a foreign state, not California. *Mazza*, 666 F.3d at 594. The bulk of the relevant, actionable conduct giving rise to the Scott I/Harrington/Kovler claims is inexorably connected to California. Moreover, Google mandates the application of California law—for both Google and its users—through the choice of law provision in its contracts. Thus, each email transmitted through the Gmail system is subject to CIPA because each transmission necessarily involves at least one Gmail user. Because Google affirmatively selects California law when it conducts business in foreign states, no state has the ability "to calibrate liability to foster commerce." *Id.*, at 593. Accordingly, no other states' interest would be impaired if California law applies.

## IV.    CONCLUSION

The Court should certify the proposed Classes.


Respectfully submitted,


Dated:  October 24, 2013                    CORY WATSON CROWDER & DEGARIS, P.C.


                         By:*/s/ F. Jerome Tapley*
                              F. Jerome Tapley (*Pro Hac Vice*)
                              Email: jtapley@cwcd.com
                              2131 Magnolia Avenue
                              Birmingham, AL 35205
                              Telephone: (205) 328-2200
                              Facsimile: (205) 324-7896

                              WYLY~ROMMEL, PLLC
                              Sean F. Rommel (*Pro Hac Vice*)
                              Email: srommel@wylyrommel.com
                              4004 Texas Boulevard
                              Texarkana, Texas 75503
                              Telephone: (903) 334-8646
                              Facsimile: (903) 334-8645

                              *Plaintiffs' Co-Lead Counsel*

**PLAINTIFFS' CONSOLIDATED MOTION FOR CLASS CERTIFICATION**

CARTER WOLDEN CURTIS, LLP
Kirk J. Wolden (SBN 138902)
Email: kirk@cwclawfirm.com
1111 Exposition Boulevard, Suite 602
Sacramento, California 95815
Telephone:  (916) 567-1111
Facsimile:  (916) 567-1112

*Plaintiffs' Liaison Counsel*